[Cite as *State v. Claren*, 2020-Ohio-615.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

| STATE OF OHIO | C.A. No. 19AP0015 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| PAUL CLAREN | COURT OF COMMON PLEAS COUNTY OF WAYNE, OHIO |
| Appellant | CASE No. 2016 CRC-I 000289 |

DECISION AND JOURNAL ENTRY

Dated: February 24, 2020

SCHAFER, Judge.

{¶1} Defendant-Appellant, Paul Claren, appeals from his convictions in the Wayne County Court of Common Pleas. This Court reverses.

I.

{¶2} Claren had been a resident of his Orrville apartment for about five years when B.G., the victim herein, moved into the complex. The apartment complex consisted of ground-level units, split into groups of three adjoining units. Claren's apartment was an end unit and was situated directly across from the end unit that B.G. shared with his friend and his girlfriend. A street servicing the complex bisected their apartments, and their front doors faced one another. Each apartment had a small, partially fenced-in patio just outside its front door and a walkway that led from the front door down to either parking spaces, the street for the complex, or a common walkway.

{¶3} Claren frequently sat in a chair that he placed on his front stoop. His front stoop consisted of a wide, concrete pad that led down to a larger concrete pad/landing that then led down to a series of concrete steps. While relaxing outside, he watched his neighbors and his observations soon led him to form a negative opinion about B.G. and B.G.'s friend. Likewise, B.G. and his friend came to dislike Claren. An altercation between B.G. and a close friend of Claren's (hereinafter "Claren's friend") in July 2016 only served to fuel the growing animosity between the two groups.

{¶4} On the morning of August 15, 2016, the police stopped B.G. based on a tip that he was driving without a license. The traffic stop took place just outside his apartment and occurred at a time when Claren was sitting on his front stoop. During the stop, Claren greeted the officer and encouraged him to search B.G.'s apartment. The officer did not do so, but found a small amount of marijuana in the vehicle and cited B.G. for possession.

{¶5} Later that same evening, Claren approached a different officer who had parked his cruiser in a lot opposite the apartment complex. Claren approached the officer on foot and indicated that he was having problems with his two "crazy" neighbors, both of whom were on drugs. Specifically, he indicated that B.G. and his friend were upset and trying to start a fight with him because they believed he had called the police about B.G. driving without a license. Claren told the officer that he did not know what the "crazy bastards [were] going to do, but, [he] [had] [his] Civil War .44 stoked up and ready to go inside [his] doorway in case [he] need[ed] it * * *." He also stated that he wanted to start documenting the situation with the police "in case these f***ers come at me and I gotta kill 'em." After listening to Claren, the officer and a second officer immediately spoke with B.G. and his friend and cautioned them to stay away from Claren.

{¶6} Over the next two days, Claren spoke to additional individuals about his neighbors. The night of August 16th, he casually approached an officer who was on his lunch break in a nearby park and mentioned that he was having problems "with the f***ing dopies across from [him]." He summarized his recent difficulties with B.G. and his friend and ultimately indicated that he kept a revolver "stoked up" right inside his doorway in the event they decided to attack him. He also referenced having a loaded firearm at the ready while speaking with the mail carrier for his apartment complex the following night (August 17th). After describing his difficulties with his neighbors, Claren told the mail carrier that he had his gun "ready for them in case they came over" and had turned off his air conditioning and opened his window "so[] he could hear them coming." That same evening, he also called the apartment complex manager to report that he felt his neighbors were verbally threatening him. Although the manager attempted to speak with Claren and B.G. in person the following morning, she was unsuccessful.

{¶7} The evening of August 18th, Claren shot B.G. once in the chest after B.G. came onto Claren's property. Several individuals witnessed at least portions of their encounter, including B.G.'s friend and Claren's friend, who was visiting him at the time. Accounts varied as to who instigated the incident and how exactly it unfolded, but most of the eyewitnesses agreed that Claren drew his gun while B.G. was still about ten feet away from him. Most of the eyewitnesses also agreed that Claren told B.G. several times, at gun point, to leave the property. It was Claren's position that he was ultimately forced to shoot B.G. because B.G. ignored his commands, came within arm's reach, and attempted to grab his gun. Yet, others indicated that B.G. had his arms raised and was daring Claren to shoot him when Claren fired his gun. Immediately after being shot, B.G. collapsed backwards onto the large concrete pad/landing just

below the top concrete pad of Claren's front stoop. He later succumbed to his injury at the hospital.

{¶8} A grand jury indicted Claren on one count of aggravated murder, one count of murder, one count of having a weapon under disability, two repeat violent offender specifications, and two firearm specifications. Claren argued self-defense at trial, but, when it came time to instruct the jury, the court refused to instruct them that self-defense was a defense to aggravated murder. Further, while the court issued a self-defense instruction on the murder count, it refused to include an instruction on the castle doctrine. The jury ultimately found Claren guilty of aggravated murder, the firearm specification linked to that count, and having a weapon under disability. The court then found him guilty of the repeat violent offender specification linked to his aggravated murder count. The court sentenced him to life without the possibility of parole as well as a three-year consecutive term on his firearm specification.

{¶9} Claren appealed from his convictions, but this Court dismissed his first appeal for lack of a final, appealable order. *See State v. Claren*, 9th Dist. Wayne No. 17AP0030, 2019-Ohio-260. The trial court then issued another journal entry, dismissing the murder charge that previously had been left unresolved.

{¶10} Claren now appeals from his convictions and raises two assignments of error for our review.

II.

**Assignment of Error I**

**The failure of the trial court to instruct the jury on the affirmative defense of self-defense, including the "castle doctrine" pursuant to R.C. 2901.09 constituted plain error and was an abuse of discretion all to the prejudice of [Claren].**

{¶11} In his first assignment of error, Claren argues that the trial court erred when it refused to instruct the jury on self-defense (as to his aggravated murder count) and the castle doctrine. Upon review, we sustain his assignment of error.

{¶12} In general, "[t]his Court reviews a trial court's decision to give or not give jury instructions for an abuse of discretion under the particular facts and circumstances of the case." *State v. Calise*, 9th Dist. Summit No. 26027, 2012-Ohio-4797, ¶ 68. The abuse of discretion standard implies that a trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the standard, a reviewing court is precluded from simply substituting its own judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). Yet, a trial court may be found to have abused its discretion "where it fails to engage in a sound reasoning process." *State v. Pieronek*, 9th Dist. Wayne No. 18AP0031, 2019-Ohio-4305, ¶ 20.

{¶13} If a defendant fails to preserve his objection to a trial court's jury instructions, he is limited to a claim of plain error. *State v. Fry*, 9th Dist. Medina No. 16CA0057-M, 2017-Ohio-9077, ¶ 20. *See also* Crim.R. 52(B). "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. Plain error exists only where there is a deviation from a legal rule, that is obvious, and that affected the defendant's substantial rights to the extent that it affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

{¶14} A self-defense instruction is warranted if a defendant "'has introduced sufficient evidence, which, if believed, would raise a question in the minds of reasonable [jurors] concerning the existence of such issue.'" *State v. Hatfield*, 9th Dist. Summit No. 23716, 2008-

Ohio-2431, ¶ 8, quoting *State v. Melchior*, 56 Ohio St.2d 15 (1978), paragraph one of the syllabus. Self-defense is an affirmative defense that a defendant must establish by a preponderance of the evidence.[1] *State v. Gates*, 9th Dist. Summit No. 24941, 2010-Ohio-2994, ¶ 7; Former R.C. 2901.05(A). If a case involves deadly force, a defendant generally must prove that

> "(1) [he] was not at fault in creating the violent situation, (2) [he] had a bona fide belief that [he] was in imminent danger of death or great bodily harm and that [his] only means of escape was the use of force, and (3) [he] did not violate any duty to retreat or avoid the danger."

*State v. Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317, ¶ 36, quoting *State v. Thomas*, 77 Ohio St.3d 323, 326 (1997); Former R.C. 2901.05. "Yet, a person has no duty to retreat from his own home." *State v. Bushner*, 9th Dist. Summit No. 26532, 2012-Ohio-5996, ¶ 14. *Accord* R.C. 2901.09(B). One "who, through no fault of [his] own, is assaulted in [his] home may stand [his] ground, meet force with force, and if necessary, kill [his] assailant, without any duty to retreat." *Thomas* at 327. Moreover, a presumption of self-defense arises if an assailant "unlawfully and without privilege to do so entered[] the residence * * * occupied by the person using the defensive force." Former R.C. 2901.05(B)(1).

{¶15} Claren conceded that he shot B.G., but argued that he did so in self-defense. There was testimony that, in the days leading up to the shooting, a series of events previously described herein caused palpable tension between Claren, B.G., and B.G.'s friend. Claren testified that, on the evening of the shooting, he was sitting in a chair on his front stoop alongside his friend who had stopped to visit. As they chatted, B.G.'s friend emerged from the apartment

---

[1] We would note that Claren was prosecuted several years before the current version of R.C. 2901.05 went into effect. The statute currently employs a burden-shifting framework. *See* R.C. 2901.05(B)(1).

he shared with B.G. and walked toward the dumpsters. B.G. emerged shortly thereafter and started heading in the same direction. He then stopped, turned back to face Claren and Claren's friend, and accused them of talking about him. According to Claren, B.G. refused to believe they had not been talking about him and became angry. Claren stated that B.G. began walking toward them and threatening "to kick our asses and stuff like that." B.G. then cut across Claren's grass and began walking up the path and steps leading to his front door.

{¶16} It was Claren's testimony that B.G. stopped on a step about ten feet away and continued to issue threats. B.G. then pointed at Claren and Claren's friend in turn and stated, "I'm going to get you and then * * * I'm going to get you." In response to that threat, Claren reached back for a loaded revolver he had been keeping just inside his doorway, set it on his lap, and told B.G. to get off his property. Claren testified that B.G. then yelled for his friend and once again began to advance. He stopped within a few feet of Claren, threatened to fight him, repeatedly told him to shoot, and removed his shirt as he continued to yell. Claren continued to tell B.G. to leave, but B.G. ignored him and came within two to three feet of the chair where he was seated. According to Claren, he was forced to shoot B.G. when B.G. attempted to grab his gun. He testified that he felt he had to shoot B.G. because he believed B.G. meant to take his gun and shoot him.

{¶17} Claren's friend also testified that B.G. was the one who initiated their confrontation that evening. He testified that, after B.G. accused them of talking about him, he walked onto Claren's property while using inflammatory language. He stated that B.G. eventually said he was "going to kick both of [their] asses" and, in response, Claren produced a gun, set it on his lap, and told B.G. to leave. Claren's friend described how reactions to the gun varied. He indicated that he was shocked by its appearance and remained quiet and still. B.G.'s

friend, who had appeared at some point, yelled for a neighbor to call 911 and ran off shortly thereafter. Yet, B.G. ignored Claren's command to leave and continued to rant. Claren's friend testified that B.G. removed his shirt, asked Claren if he intended to shoot him, and told him to shoot. He stated that Claren told B.G. several times to leave, but B.G. continued to stand there and yell. He testified that B.G. came closer, until he was essentially face-to-face with Claren, and reached out before Claren shot him.

{¶18} B.G.'s friend testified that Claren and Claren's friend initiated their confrontation that evening. It was his testimony that the two yelled out and began "run[ning] their mouths" as he and B.G. were walking across the parking lot. He acknowledged that, just three evenings earlier, the police had cautioned him and B.G. to stay away from Claren. Nevertheless, he stated that B.G. immediately went to confront the men. He testified that he stayed away until B.G. yelled that Claren had a gun. At that point, he too ran over and stood nearby B.G. For the next few minutes, everyone was yelling at one another and B.G. was telling Claren "to put the gun down and fight like a man." He confirmed that Claren told them, at gun point, that he wanted them off his property, but they did not comply. B.G.'s friend grudgingly admitted that B.G. was stubborn and, like him, a "hothead." He testified that B.G. ultimately came within two to three feet of Claren, but had his hands in the air before he got shot. Yet, he admitted that he did not see the actual shooting because he was looking elsewhere when Claren pulled the trigger.

**Self-Defense & Aggravated Murder**

{¶19} At the close of the evidence, the court briefly discussed the jury instructions with the parties. The court noted that, in the State's proposed instructions, it had included self-defense as a defense to the charge of having a weapon under disability. The following exchange then occurred:

THE COURT: * * * I think the State had self-defense as a defense to weapon under disability, but, it's not, so, it would just be as a defense to the murder charge.

[DEFENSE COUNSEL]: Or to aggravated murder.

THE COURT: Pardon?

[DEFENSE COUNSEL]: Murder or aggravated murder.

THE COURT: Well --

[DEFENSE COUNSEL]: The self-defense.

THE COURT: Aggravated murder, what's your position on that, [prosecutor]?

[PROSECUTOR]: * * * I don't believe the self-defense is a defense to aggravated murder, the prior calculation and design, I believe it is a defense to Count 2, the regular murder charge, self-defense is an appropriate instruction there.

THE COURT: Yeah, that would be my thinking * * *.

No further discussion about the self-defense instruction took place. The court later instructed the jury on self-defense only with respect to Claren's murder charge.

{¶20} Claren did not object when the trial court refused to issue the jury a self-defense instruction on his aggravated murder charge. Nor did he present the court with any law or argument on that issue. He concedes that he is limited to a claim of plain error on appeal. As such, in reviewing his argument, we must determine whether the trial court committed an obvious error and, if so, whether "the evidence presented by [Claren], if believed by a properly instructed jury, would [have] support[ed] an acquittal on the grounds of [self-defense]." *State v. Williford*, 49 Ohio St.3d 247, 252 (1990). *See also State v. Baskerville*, 9th Dist. Summit No. 28148, 2017-Ohio-4050, ¶ 48.

{¶21} The only reason the trial court offered for refusing to include the self-defense instruction herein was that it accepted the prosecutor's position that the theories of self-defense and prior calculation and design are inconsistent as a matter of law. Yet, "there are affirmative

defenses which do not seek to negate any of the elements of the offense which the [S]tate is required to prove. This is the nature of self-defense under Ohio law." (Internal citation omitted.) *State v. Martin*, 21 Ohio St.3d 91, 94 (1986). "The elements of [aggravated murder] and the existence of self-defense are separate issues * * *," *id.*, and self-defense has frequently been raised as a defense to aggravated murder. *See, e.g., State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751; *State v. Taylor*, 78 Ohio St.3d 15 (1997); *Martin, supra*; *State v. Jackson*, 22 Ohio St.3d 281 (1986). The trial court was therefore incorrect when it concluded, as a matter of law, that self-defense is not a defense to a charge of aggravated murder with prior calculation and design.

{¶22} On appeal, the State asserts that the court's legal error, if any, was harmless because Claren was not entitled to any self-defense instruction. It argues that Claren set forth insufficient evidence in support of his affirmative defense, so the court ought to have withheld the instruction on both his aggravated murder and murder charges. Yet, in the court below, the State specifically acknowledged that self-defense was "an appropriate instruction" on "the regular murder charge." There was no difference in the evidence Claren adduced to defend against each of his murder charges. He set forth evidence that B.G. initiated the affray, B.G. came onto his property without permission and ignored his commands to leave, B.G. came within arm's reach while threatening to harm him, B.G. reached for his gun, and he felt he had no choice but to shoot B.G. Though other witnesses testified differently, a sufficiency analysis does not concern itself with the weight, credibility, or believability of the evidence presented. *See State v. Johnson*, 9th Dist. Lorain No. 13CA010496, 2015-Ohio-1689, ¶ 10-11. Claren only had to set forth "sufficient evidence, which, if believed, would raise a question in the minds of reasonable [jurors] concerning the existence of [his self-defense claim].'" *Hatfield*, 2008-Ohio-

2431, at ¶ 8, quoting *Melchior*, 56 Ohio St.2d 15 at paragraph one of the syllabus. The record supports the conclusion that he did so. Accordingly, Claren has demonstrated that the trial court committed an obvious error in refusing to instruct the jury on self-defense for purposes of his aggravated murder charge. The only remaining question is whether that error affected his substantial rights to the extent that it was outcome determinative in nature. *See Williford*, 49 Ohio St.3d at 252. Before addressing that question, we consider the court's decision not to instruct the jury on the castle doctrine.

**The Castle Doctrine**

{¶23} Claren also asserts that the trial court erred when it refused to instruct the jury that he had no duty to retreat. He argues plain error based on his failure to formally object to the trial court's refusal to issue the instruction. *See* Crim.R. 30(A). Yet,

> [a] party does not [forfeit] his objections to the court's charge by failing to formally object thereto (1) where the record affirmatively shows that a trial court has been fully apprised of the correct law governing a material issue in dispute, and (2) the requesting party has been unsuccessful in obtaining the inclusion of that law in the trial court's charge to the jury.

*State v. Wolons*, 44 Ohio St.3d 64 (1989), paragraph one of the syllabus. The record reflects that Claren requested an instruction on the castle doctrine in his proposed jury instructions with a memorandum in support of the instruction, argued for the inclusion of the instruction at the start of trial, participated in an off-the-record side bar discussion about the instruction at the conclusion of trial, and renewed his request for the instruction when the court finished instructing the jury. Meanwhile, the State opposed the instruction and provided the court with case law in support of its argument. Though Claren was unsuccessful in obtaining the instruction, the record affirmatively shows that the trial court was apprised of both his and the State's positions on the issue and the governing law. *See id.* Under these circumstances, we

cannot conclude that Claren forfeited his argument by failing to formally object. *See State v. Gall*, 9th Dist. Lorain No. 18CA011445, 2019-Ohio-4907, ¶ 20. We, therefore, review the court's decision not to issue a castle doctrine instruction for an abuse of discretion. *See Calise*, 2012-Ohio-4797, at ¶ 68.

{¶24} If an unprovoked attack occurs in or about a person's residence, the castle doctrine obviates his duty to retreat before employing deadly force. *See Thomas*, 77 Ohio St.3d at 327. The doctrine recognizes "that one's home is one's castle and one has a right to protect it and those within it from intrusion or attack." *Id.* Further, to invoke the doctrine, a person need not be within the confines of the four walls of his home. *See, e.g., Williford*, 49 Ohio St.3d at 250 (victim shot on defendant's porch); *Jackson*, 22 Ohio St.3d at 284-285 (victim shot while walking up porch stairs leading to defendant's apartment). A person's "residence" is defined as a "building or conveyance of any kind that has a roof over it and that is designed to be occupied by people lodging [there] at night, * * * includ[ing] but [] not limited to, an attached porch * * *." Former R.C. 2901.05(D)(2) and (D)(3).

{¶25} The trial court offered an extremely limited rationale on the record for its refusal to issue a castle doctrine instruction. It was the State's position that Claren was not entitled to the instruction because he was not sitting inside his house or on an attached porch when he shot B.G. It was Claren's position that the area where he was sitting was a part of his "residence" for purposes of Former R.C. 2901.05(D)(2). In rejecting Claren's renewed request for the instruction, the only statement the court made was that it was "of the opinion that the evidence doesn't support or the facts don't show that the defendant was unlawfully entering the residence and therefore, the Castle Doctrine does not apply." Presumably, the trial court misspoke and meant to say "the victim" rather than "the defendant."

{¶26} Upon review, it is not clear from the record whether the trial court refused to issue a castle doctrine instruction because (1) it believed the doctrine was applicable only if Claren was attacked within the four walls of his residence, or (2) it concluded that the Claren's front stoop was not part of his "residence" under Former R.C. 2901.05(D)(2). Moreover, it appears that the court may have conflated the castle doctrine with the statutory presumption of self-defense that may arise in certain instances. *See* Former R.C. 2901.05(B)(1) (rebuttable presumption of self-defense arises if defendant used deadly force against a person who entered his residence unlawfully and without privilege to do so). A victim's legal status (i.e., whether he was lawfully present) is only relevant to the statutory presumption of self-defense. *State v. Bushner*, 9th Dist. Summit No. 26532, 2012-Ohio-5996, ¶ 16. The castle doctrine applies, regardless of the victim's legal status, if *the defendant* "was lawfully occupying the residence at the time he used the deadly force." *Id.*

{¶27} It is undisputed that the affray herein occurred on property Claren was lawfully occupying. Thus, the only issue before the court was whether Claren set forth sufficient evidence that the exact spot where the shooting occurred was part of his "residence." *See* Former R.C. 2901.05(D)(2). It appears from the record, however, that the court declined to issue the instruction for other reasons. As such, we cannot conclude that it "engag[ed] in a sound reasoning process." *Pieronek*, 2019-Ohio-4305, at ¶ 20. Claren set forth evidence that he shot B.G. from a chair on his front stoop. The stoop consisted of a concrete pad, just below a small overhang, directly outside his front door. Indeed, Claren was so close to his front door that he was able to reach back inside it from his seated position to grab the loaded revolver he had left just inside. The Supreme Court has recognized the propriety of a castle doctrine instruction in similar circumstances. *See Jackson*, 22 Ohio St.3d at 281-281 (castle doctrine instruction

"would have been appropriate," *id.* at 285, where defendant shot victim to death "[a]s the victim began to walk up the porch stairs toward the outside doorway of [the defendant's] apartment," *id.* at 281). Given Claren's location at the time of the shooting, the applicable case law, and the misguided rationale the court employed in reaching its decision, we must conclude that the trial court abused its discretion when it failed to instruct the jury on the castle doctrine.

### Nature of the Court's Errors

{¶28} Having determined that the trial court committed an obvious error and abused its discretion by not instructing the jury on self-defense (as to aggravated murder) and the castle doctrine, this Court now must decide whether those errors warrant reversal. *See Williford*, 49 Ohio St.3d at 250-251. Under these facts and circumstances, we have no choice but to answer that question in the affirmative. Claren's entire defense was premised upon his having acted in self-defense. He did not learn until the close of the evidence that the trial court would not permit the jury to consider that defense on his most serious charge. Though the jury ultimately may have rejected his defense, this Court "is not convinced beyond a reasonable doubt that, had the jury been fully apprised of the law of self-defense, the verdict would have been the same." *State v. Cuttiford*, 93 Ohio App.3d 546, 559 (9th Dist.1994). Claren "presented testimony which, if believed by a properly instructed jury, would have supported an acquittal." *Williford* at 251. Indeed, if the affray occurred in the manner he described, he was entitled to a *presumption* that he acted in self-defense. *See* Former R.C. 2901.05(B)(1). The record also reflects that, because the court refused to issue a castle doctrine instruction, the State was able to emphasize Claren's failure to retreat. The prosecutor drew considerable attention to the fact that Claren did not walk inside and lock his door when B.G. came onto his property. Had the jury been properly instructed on self-defense (as to aggravated murder) and on the castle doctrine, the result in this

matter may well have been otherwise. *See Williford* at 253 (court's error in not instructing on affirmative defense, when combined with its failure to instruct on the castle doctrine, resulted in plain error). *See also Cuttiford* at 559. Accordingly, Claren's first assignment of error is sustained, his aggravated murder conviction is vacated, and this matter is remanded for further proceedings consistent with this opinion.

### Assignment of Error II

**[Claren] received ineffective assistance of counsel when trial counsel failed to object to the trial court's decision to not instruct the jury on self-defense in violation of the Defendant's rights under the Sixth and Fourteenth Amendments to the United States Constitution.**

{¶29} In his second assignment of error, Claren argues that he received ineffective assistance of counsel because his attorney failed to object when the court refused to instruct the jury on self-defense (as to his aggravated murder count) and the castle doctrine. Given this Court's resolution of Claren's first assignment of error, his second assignment of error is moot, and we decline to address it. *See* App.R. 12(A)(1)(c).

### III.

{¶30} Claren's first assignment of error is sustained. His second assignment of error is moot, and we decline to address it. The judgment of the Wayne County Court of Common Pleas is reversed, and the cause is remanded for further proceedings consistent with the foregoing opinion.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

_____
JULIE A. SCHAFER
FOR THE COURT

TEODOSIO, P. J.
CARR, J.
CONCUR.


APPEARANCES:

NORMAN R. "BING" MILLER, JR., Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and ANDREA D. UHLER, Assistant Prosecuting Attorney, for Appellee.