[Cite as *State v. Moore*, 2020-Ohio-4321.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY

STATE OF OHIO,                    :        Case No. 19CA13

    Plaintiff-Appellee,          :

v.                                :        <u>DECISION AND</u>
                                           <u>JUDGMENT ENTRY</u>

JAMES W. MOORE,                   :

    Defendant-Appellant.         :        **RELEASED 8/26/2020**
_____

<u>APPEARANCES</u>:

Christopher J. Pagan, Repper Pagan Law, Ltd., Middletown, Ohio, for appellant.

Brigham M. Anderson, Lawrence County Prosecutor, and W. Mack Anderson, Lawrence County Assistant Prosecutor, Ironton, Ohio, for appellee.
_____

Hess, J.

**{¶1}** James Moore appeals his convictions, following a jury trial, for aggravated murder and tampering with evidence in connection with the shooting death of Homer Fredrick "Fred" Crank. Moore contends that the trial court committed plain error by not instructing the jury that he had no duty to retreat before using force in self-defense under R.C. 2901.09(B), that there was a presumption of self-defense under former R.C. 2901.05(B)(1), and that he had a right to defend his residence, business, and personal property, and he contends that trial counsel rendered ineffective assistance by not objecting to these errors. However, R.C. 2901.09(B) does not apply because Moore was not in his residence when the shooting occurred, former R.C. 2901.05(B)(1) does not apply because Crank was not in or in the process of entering Moore's residence when Moore shot him, Moore's residence and business were not under attack when he

shot Crank, and Moore denied shooting Crank to defend Moore's personal property. Thus, the trial court did not err by omitting instructions on these matters, and counsel's failure to object to the jury instructions was not deficient performance.

{¶2} Moore also contends that his aggravated murder conviction is not supported by sufficient evidence and is against the manifest weight of the evidence due to a lack of proof of prior calculation and design. However, after viewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found that element proven beyond a reasonable doubt, and after weighing the evidence and all reasonable inferences, considering the credibility of the witnesses after according the requisite deference to the jury's determinations, we conclude that in resolving evidentiary conflicts, the jury did not clearly lose its way or create a manifest miscarriage of justice so that we must reverse its verdict. Accordingly, we reject Moore's arguments and affirm the trial court's judgment.

I. FACTS AND PROCEDURAL HISTORY

{¶3} The Lawrence County grand jury indicted Moore on one count of aggravated murder in violation of R.C. 2903.01(A) and one count of tampering with evidence in violation of R.C. 2921.12(A)(1). He pleaded not guilty and the matter proceeded to a jury trial.

{¶4} The state presented evidence that on the evening of August 27, 2018, law enforcement responded to a dispatch about a shooting at Moore's home. When they arrived, Moore was at the scene, and Crank, who had been shot five times, was dead in the gravel driveway, lying several feet between the entrance to Moore's garage, which was perpendicular to the roadway, and a damaged jeep, which was parked parallel to

the garage entrance with the front of the vehicle facing the roadway. Crank was wearing gloves, there was a metal pry bar next to his body, and there was a small wooden baseball bat on the ground in front of the garage entrance.

{¶5} Detective Sergeant Aaron Bollinger of the Lawrence County Sheriff's Office testified that he interviewed Moore at the scene around 1:00 a.m. on August 28, 2018. Moore told Detective Bollinger that he knew Crank but they were not friends. Moore had helped Crank in the past because he had dated Angel Borderlin, the ex-girlfriend of Chris Dishman, a friend of Moore who had died about two weeks earlier. The day of the shooting, Moore messaged Crank about a transmission job for Carl Davis, and Crank asked if Moore was home. About 30 to 45 minutes before the shooting, Crank came over while Moore was in his garage. Crank told Moore about his plan to use Borderlin to take control of Dishman's house. Moore had secured the house after Dishman's death by kicking out drug users and changing the locks, and Moore told Detective Bollinger that "now this fucktard thinks he's coming out here telling me he's going to do all this stuff." Moore told Crank that Dishman's will stated how "everything is going to be done." Crank said that he was going to his vehicle to get some cigars but instead got a bat. Crank started to hit one of Moore's vehicles—a jeep—with the bat and then started coming toward Moore and saying that he was going to kill Moore. Moore pulled out his gun and said something like, "Fred! Don't do this shit!" Crank threw the bat at Moore and then went to Crank's vehicle, got a metal bar, and used it to hit the jeep. Crank came at Moore and threatened to kill him, and Moore shot Crank. Moore fired additional shots because Crank continued to come toward him. Afterwards, Moore tried to contact Detective Joe Ross of the Ironton Police Department, Moore's

mother, and his friend Bill Schwab.  Moore did not know if Crank had been drinking because Crank was "a meth head" who did "crazy shit all the time."  Moore had cameras around his house but did not know if they were recording.  Detective Bollinger testified that Moore smelled like beer but did not appear intoxicated.  Moore told him that he had about 10 beers that evening but "can drink a lot."

{¶6}   Moore's digital video recording ("DVR") system was recording, and the footage shows that prior to the shooting, Moore and Crank were together for about two hours and 45 minutes.  They spend most of that time sitting in the garage and talking.  About 45 minutes after Crank arrives, Moore gives Crank a stack of clothes, which Crank separates into two piles.  About an hour and 45 minutes later, Moore walks out of view and returns with a bat under his left arm and what appear to be two cans.  He sets one can down near his chair, hands the other to Crank, and lets Crank take the bat.  Shortly after that, Crank stands up, walks outside, and hits the jeep with the bat for about 30 seconds.  Moore stands and appears to touch his holstered firearm around the time Crank stops and comes back to the garage.  The men briefly talk and sit again.  About two minutes later, Crank goes outside again and hits the jeep with the bat for about 40 seconds.  During this time, Moore stands up, walks outside, unholsters his firearm, and holds it down by his right side, which is facing away from Crank.  Crank stops hitting the jeep, Moore reholsters his firearm, and they return to the garage, where they sit and Crank puts the bat down.

{¶7}   A few minutes later, Moore picks up the pry bar from someplace near his chair, puts it on the ground, and Crank walks over, picks it up in his ungloved hands, and then goes to his own vehicle.  During this time, Moore appears to get two drinks

and puts one by Crank's chair and one by his own chair.  Crank goes to the jeep and starts hitting it with the pry bar.  Moore walks outside but then returns to the garage while handling his holstered firearm.  He adjusts the firearm, takes a drink, walks outside again, and stops about halfway between the garage entrance and the driver's side of the jeep.  Crank briefly walks away from the jeep, near Moore, and then walks to the passenger side of the jeep.  There is a 12 second gap in the footage due to the settings on Moore's DVR system.  When the footage resumes, Moore is in front of the jeep, and Crank appears to come from around the back of the vehicle and hits the jeep near the driver's side door handle.  Crank lowers the pry bar toward the ground and appears to touch his chest.   Crank takes a few steps forward, there are two flashes, and Crank falls in the direction of the garage entrance, landing between it and the jeep. In the minutes that follow, Moore moves the clothing, picks up the pry bar from an area by the jeep and puts it next to Crank's body, kicks the bat outside, puts alcohol containers that were by Crank's chair into a bucket, covers the bucket with a box, and goes to Crank's vehicle.

{¶8}   A search of Moore's cell phone revealed that the day of the shooting, Moore exchanged messages with Davis and Crank about a transmission job Davis wanted done the next morning.  At 8:42 p.m., Moore told Davis that he found a guy who would do the job but wanted to talk to Davis about the pay, and at 9:03 p.m., Moore told Davis, "I know he's a meth head and he does do pretty good work but I don't like being around him but I'm just trying to help you out—he just said about 100 and some stuff to pick him up—he is here now if you want to come over."  At 9:32 p.m., Moore sent Schwab a message stating:  "Angel is seeing Dave * * * and she has been talking to

Fred about all that stuff in the house to [sic] and Stacy and Dave and Angel is [sic] going to move in the house and it's gonna be a bad deal – Fred has something to do with it to [sic]."  Schwab responded, "Wow," and at 9:52 p.m., Moore answered, "Fred is here now and scary but I will be ok brother."  At 11:16 p.m., Moore messaged Detective Ross, "I need you at my house now I just killed Fred Crank he was here trying to kill me."   Moore later messaged Detective Ross, "Joe I need you here I just killed Fred Crank at my house he was trying to kill me."

{¶9}    Barbara Massie met Crank a few months before his death and testified that he used drugs and was suicidal since the day she met him.  Massie tried to help Crank because she is a recovering addict.  She let him sleep in his van outside her house and would let him into her home to eat and shower.  Massie testified that there had been an issue between Crank and Moore related to some merchandise Crank had stolen that Moore would not let him keep at Moore's property.  About a week before Crank's death, Moore asked Massie to tell Crank that there were "no hard feelings" and that he could come to Moore's place to talk and "drink a few beers if he wanted to."  The morning of the shooting, Crank came into Massie's home and she offered him breakfast.  He declined because he "needed to do a shot."  Crank left to do drugs, and when he returned, he told Massie that he was going to take Moore "up on his offer and drink some free beer."  Prior to leaving, Crank said, "I just can't wait for this to be all over," which Massie interpreted to mean that he "wanted to die" and was "going to try suicide again."

{¶10} Benjamin Hall testified that he had known Crank since they were kids and did not know Moore.  The day of Crank's death, Crank was at Hall's home from 5:00 or

6:00 p.m. until about 8:00 p.m.  Crank told Hall that he was "getting himself clean," and Hall thought Crank looked "pretty healthy" and did not appear to be high or under the influence of alcohol.  Crank told Hall that he was going to Moore's house to do a transmission job.  Before leaving, Crank said that if somebody pulled out a gun and asked who wanted to die, he would be the first to raise his hand.

{¶11} Moore gave the following testimony.  Moore met Crank about five or six months prior to his death, let Crank stay at his house for a few days because Moore "felt sorry for him," and made Crank leave after he stole from Moore and brought a stolen car trailer to the house.  Moore reported the car trailer to the police but testified he did not have any hard feelings towards Crank and continued to invite him over when Moore had a job for him.  The day of the shooting, Moore messaged Crank about a transmission job, and Crank came over.  Crank was agitated and angry at different times throughout the evening, and Moore gave him alcohol "to calm him down."  At some point, Crank told Moore his plan to take over Dishman's house and got upset when Moore told him that he "couldn't have anything to do with" Dishman's estate.

{¶12} Moore offered Crank some clothes to replace ones that were stolen from his van and gave Crank the bat because it belonged to Crank and he wanted it back for self-protection.  Moore testified that he always carries a gun and admitted that he put a hand on it when Crank started hitting the jeep with the bat.  Moore claimed he did not know why Crank hit the jeep and asked him to stop, and Crank said that he wanted to kill Moore.  When Crank stopped hitting the jeep, Moore tried to calm him down, but Crank hit the jeep again and continued to threaten Moore.  Moore unholstered his gun because he was afraid and wanted to ask Crank to stop.  However, when Moore did ask

Crank to stop, Moore did not show him the gun. Moore later gave Crank the pry bar because it belonged to him, and Moore thought Crank was going to leave. After Crank took the bar and went to his vehicle, Moore went inside the house to get more beer to try to calm Crank down. After Crank started hitting the jeep with the bar, Moore walked out to Crank, unholstered his firearm again, aimed it at Crank, and told him to stop. Moore denied shooting Crank to make him stop hitting the jeep. Moore testified that he fired the initial shot because Crank was coming at him saying that Crank was going to kill Moore, and Moore felt threatened and thought his life was in danger. Moore fired additional shots because Crank kept coming at him. Moore did not call 9-1-1 after the shooting but tried to contact two officers that he knew. Moore did not know why he moved items after the shooting. Moore testified that he was impaired and said, "I think I was just cleaning up for the day, now that I see the video." Moore later testified that he put the pry bar next to Crank and put Crank's cell phone in his vehicle because those items belonged to Crank. Moore apologized "for lying" during the interview with Detective Bollinger but claimed that he did not remember the interview because he was in shock and not thinking clearly after the shooting.

{¶13} The jury found Moore guilty as charged, the trial court sentenced him, and we granted Moore leave to file a delayed appeal.

## II. ASSIGNMENTS OF ERROR

{¶14} Moore assigns the following errors for our review:

**Assignment of Error I**

The trial court erred by providing an erroneous self-defense instruction; and it was error to fail to instruct on defense of residence, business, and personal property.

**Assignment of Error II**

The trial court erred by entering judgment against Moore for aggravated murder because there was insufficient evidence of prior calculation and design; and the judgment is unlawful because the finding of prior calculation and design was against the manifest weight of the evidence.

### III.  JURY INSTRUCTIONS

**{¶15}** In the first assignment of error, Moore contends that the trial court erred in several ways when it instructed the jury.  He acknowledges that trial counsel did not object to the jury instructions and asserts that the trial court committed plain error and that counsel rendered ineffective assistance.

**{¶16}** "A trial court is obligated to provide jury instructions that correctly and completely state the law.  The jury instructions must also be warranted by the evidence presented in a case.  The question of whether a jury instruction is legally correct and factually warranted is subject to de novo review."  (Citations omitted.)  *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 22.  "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection."  Crim.R. 30(A).  "Thus, a defendant's failure to object to the challenged instruction forfeits all but plain error."  *State v. McIntosh*, 4th Dist. Gallia No. 17CA14, 2018-Ohio-5343, ¶ 59, citing *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 57.

**{¶17}** Crim.R. 52(B) states:  "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."  To establish plain error, a defendant must show: (1) there was an error, i.e., a deviation from a legal rule, (2) the error was an obvious defect in the proceedings, and (3) the

error affected substantial rights, i.e., it impacted the outcome of the trial. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. The defendant must "demonstrate a reasonable *probability* that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis sic.) *Id.* "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶18} To prevail on an ineffective assistance claim, a defendant must show: "(1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 113, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Failure to satisfy either part of the test is fatal to the claim. *See Strickland* at 697. The defendant "has the burden of proof because in Ohio, a properly licensed attorney is presumed competent." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.E. 83 (1955).

### A. Duty to Retreat

{¶19} Moore contends that the trial court committed plain error by not instructing the jury that he did not have a duty to retreat from his residence under the castle doctrine, which is codified in R.C. 2901.09(B), and that counsel rendered ineffective assistance by not objecting to this error. Moore asserts that the altercation between him and Crank transitioned between the open garage and curtilage, i.e., Moore's driveway. Moore maintains that his garage is a "residence" pursuant to R.C. 2901.05(D)(3) and that "the majority rule is that the curtilage is in the definition of residence for self-defense purposes." He also cites *State v. Jackson*, 22 Ohio St.3d 281, 490 N.E.2d 893 (1986), *State v. Williford*, 49 Ohio St.3d 247, 551 N.E.2d 1279 (1990), and *State v. Claren*, 9th Dist. Wayne No. 19AP15, 2020-Ohio-615, for the position that there is no duty to retreat when deadly force is used close to a residence.

{¶20} R.C. 2901.09(B) states: "For purposes of any section of the Revised Code that sets forth a criminal offense, a person who lawfully is *in that person's residence* has no duty to retreat before using force in self-defense * * *." (Emphasis added.) " 'Residence' means a dwelling in which a person resides either temporarily or permanently or is visiting as a guest." R.C. 2901.05(D)(3); *see* R.C. 2901.09(A) (as used in R.C. 2901.09, "residence" has the same meaning as in R.C. 2901.05). " 'Dwelling' means a building or conveyance of any kind that has a roof over it and that is designed to be occupied by people lodging in the building or conveyance at night, regardless of whether the building or conveyance is temporary or permanent or is mobile or immobile." R.C. 2901.05(D)(2). "[A] building or conveyance includes, but is

not limited to, an attached porch, and a building or conveyance with a roof over it includes, but is not limited to, a tent." *Id.*

**{¶21}** R.C. 2901.09(B) does not apply because Moore was not in his residence when he used force against Crank. Moore voluntarily left his garage, went into the driveway, and was several feet from the garage entrance when he shot Crank. Moore's driveway is not a residence under R.C. 2901.05(D)(3) because it is not a dwelling under R.C. 2901.05(D)(2), i.e., a building with a roof over it that is designed to be occupied by people lodging in it at night. The contention that the driveway is curtilage that is within the definition of a residence is not well-taken. We have explained:

> The curtilage is the area around a home that a resident may reasonably expect to enjoy the sanctity and privacy of the home. Generally, the extent of a home's curtilage is determined under four main factors: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the use to which the area is put; and (4) the steps taken to protect the area from observation by passersby.

(Citation omitted.) *State v. Ash*, 4th Dist. Pickaway No. 15CA1, 2015-Ohio-4974, ¶ 10. Moore provides no analysis of these factors, and even if he had demonstrated that his driveway was curtilage, R.C. 2901.05(D)(2) does not state that a building includes curtilage. The statute states that a building "includes, but is not limited to, an attached porch," R.C. 2901.05(D)(2), and Moore has not demonstrated that his driveway is analogous to an attached porch.

**{¶22}** Moore's reliance on *Jackson*, *Williford*, and *Claren* is misplaced. In *Jackson*, the victim hit the defendant while in the defendant's apartment, the victim was escorted out but returned, a struggle ensued that moved to the yard, and after the fight was broken up, the defendant went into his apartment, got a gun, and shot the victim as

he "began to walk up the porch stairs toward the outside doorway of [the defendant's] apartment." *Jackson*, 22 Ohio St.3d at 281, 490 N.E.2d 893. The Supreme Court of Ohio held that a jury instruction that the defendant had no duty to retreat when "attacked in or about his home" "would have been appropriate to the evidence adduced at trial," but its omission was not prejudicial under the circumstances. *Id.* at 284-285. In *Williford*, there was evidence that the victim came onto the defendant's front porch and threatened his wife, and the defendant went inside, got a revolver from upstairs, came downstairs, found the victim inside the home, displayed the gun, forced the victim onto the porch, and shot the victim when he attacked the defendant's wife, who had come out onto the porch. *Williford*, 49 Ohio St.3d at 248, 551 N.E.2d 1279. The Supreme Court of Ohio held that the trial court erred by not instructing the jury that the defendant did not have a duty to retreat from his home because "there was testimony that the confrontation took place inside [the defendant's] house and on [his] porch." *Id.* at 250. In *Claren*, the defendant testified that he shot the victim from a chair on the defendant's front stoop after the victim threatened him and tried to grab his gun. *Claren*, 9th Dist. Wayne No. 19AP15, 2020-Ohio-615, at ¶ 15-16. The appellate court held that the trial court erred by not instructing the jury on the castle doctrine because the stoop "consisted of a concrete pad, just below a small overhang, directly outside [the defendant's] front door," the defendant "was so close to his front door that he was able to reach back inside it from his seated position to grab the loaded revolver he had left just inside," and in *Jackson,* the Supreme Court of Ohio "recognized the propriety of a castle doctrine instruction in similar circumstances." *Id.* at ¶ 27.

{¶23} These cases are inapposite. None of them considered whether there is a duty to retreat from one's driveway. And notably, *Jackson* and *Williford* pre-date the 2008 enactment of R.C. 2901.09, R.C. 2901.05(D)(2), and R.C. 2901.05(D)(3) and involved porches, which the General Assembly specifically addressed when it defined a "dwelling" in R.C. 2901.05(D)(2).

{¶24} Prior to the enactment of these statutes, several Ohio appellate courts held that there is a duty to retreat from one's driveway. *State v. Marbury*, 2d Dist. Montgomery No. 19226, 2004-Ohio-1817, ¶ 20-21 (trial court did not err by refusing to instruct jury that the defendant had no duty to retreat from his property because the defendant "was not in his 'home' when he was allegedly threatened by the victim and used force to repel the threat. He was outside his home, on the driveway. Courts have held that the exception to the no duty to retreat rule does not then apply, because the actor is neither in his home nor is his home being attacked"); *State v. Rhym*, 8th Dist. Cuyahoga No. 67750, 1995 WL 444505, *6 (July 27, 1995) ("this court has consistently held that the duty to retreat extends to the driveway of one's own home"); *State v. Lansberry*, 9th Dist. Summit No. 21006, 2002-Ohio-4401, ¶ 10-11 (stating "it is settled law in several other districts" that the duty to retreat extends to one's driveway and holding that defendant was not entitled to a no duty to retreat instruction where he "voluntarily left the sanctuary of his home and went outside onto his driveway, which is where the shooting subsequently occurred"); *State v. Schumacher*, 12th Dist. Brown No. CA97-12-023, 1998 WL 761639, *2 (Nov. 2, 1998) ("For purposes of self-defense, a duty to retreat extends to the driveway of one's own home"). The General Assembly did not alter this rule and include driveways in the definition of a dwelling in R.C.

2901.05(D)(2). *See generally Mann v. Northgate Investors, L.L.C.*, 138 Ohio St.3d 175, 2014-Ohio-455, 5 N.E.3d 594, ¶ 17, quoting *Shump v. First Continental-Robinwood Assocs.*, 71 Ohio St.3d 414, 420, 644 N.E.2d 291 (1994), quoting *State ex rel. Morris v. Sullivan*, 81 Ohio St.79, 90 N.E. 146 (1909), syllabus (" ' "Statutes are to be read and construed in the light of and with reference to the rules and principles of the common law in force at the time of their enactment, and in giving construction to a statute the legislature will not be presumed or held, to have intended a repeal of the settled rules of the common law unless the language employed by it clearly expresses or imports such intention" ' " (Emphasis deleted.)).

**{¶25}** For the foregoing reasons, we conclude that the trial court did not err when it did not instruct the jury on R.C. 2901.09(B), and counsel's failure to object on this issue was not deficient performance.

### B. Presumption of Self-Defense

**{¶26}** Moore contends that the trial court committed plain error when it instructed the jury that he had the burden to prove self-defense and that counsel rendered ineffective assistance by failing to object to this error. He asserts that there was a presumption of self-defense under former R.C. 2901.05(B)(1) which the state had to overcome because when he shot Crank, Crank was in the process of entering or had entered Moore's residence unlawfully and without privilege to do so. Moore again relies on *Jackson*, *Williford*, and *Claren*.

**{¶27}** The parties agreed that the version of R.C. 2901.05 in effect prior to March 28, 2019 applies in this case. Former R.C. 2901.05(A) stated: "The burden of going forward with evidence of an affirmative defense, and the burden of proof, by a

preponderance of the evidence, for an affirmative defense, is upon the accused."

Former R.C. 2901.05(B)(1) stated:

> Subject to division (B)(2) of this section, a person is presumed to have acted in self defense or defense of another when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence * * * occupied by the person using the defensive force."

In the previous section, we set forth the definition of a "residence" in R.C. 2901.05(D)(3) and related definition of a "dwelling" in R.C. 2901.05(D)(2).

{¶28} Former R.C. 2901.05(B)(1) does not apply because Crank was not in Moore's residence or in the process of entering it when Moore shot him. Crank was in the driveway, several feet from the garage entrance. As we explained in the previous section, Moore's driveway is not a residence under R.C. 2901.05(D)(3) because it is not a dwelling under R.C. 2901.05(D)(2). Thus, the trial court did not err when it did not instruct the jury on former R.C. 2901.05(B)(1), and counsel's failure to object on this issue was not deficient performance.

### C. Defense of Residence, Business, and Personal Property

{¶29} Moore contends that the jury instructions did not "cover the available defenses." Moore asserts that there was a "simultaneous assault" on his residence, "body and repair workshop," and personal property, that the court should have instructed the jury on his right to defend his residence, business, and personal property, and that counsel rendered ineffective assistance by not objecting to this failure. He claims that there is no duty to retreat when defending a residence or business and that

there is a reasonable probability he would have prevailed at trial "with no duty to retreat and a full panoply of valid defenses."

{¶30} Moore's argument is not well-taken.  Moore's residence and business were not under attack when he shot Crank.  Although Crank was damaging Moore's jeep, Moore specifically denied shooting Crank to defend Moore's personal property. Moore testified that he shot Crank because Crank was coming at him and threatening to kill him, and Moore thought his life was in danger.  Thus, the trial court did not err when it did not instruct the jury on defense of a residence, business, or personal property, and counsel's failure to object on this issue was not deficient performance.  Accordingly, we overrule the first assignment of error.

### IV.  Sufficiency and Manifest Weight of the Evidence

{¶31} In the second assignment of error, Moore contends that his conviction for aggravated murder is not supported by sufficient evidence and is against the manifest weight of the evidence due to a lack of proof of prior calculation and design.  Moore claims that he and Crank did not have a strained relationship, noting that he offered Crank a transmission job and the absence of evidence that the job was a "ruse" to lure Crank to Moore's property.  Moore asserts that he did not deliberate in choosing a murder weapon and location—he always carries a firearm and invited Crank to a place under video surveillance where the transmission could be repaired, not a "concealed location."  Moore claims that the "affray arose when the victim wielded and used a deadly weapon in a fit of irrational rage," that these acts "likely surprised, terrorized, angered, and confused" Moore, and that he "simply responded to these acts" during "an instantaneous eruption of events," not with "cool-minded reflection."

**{¶32}** "When a court reviews a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " (Alteration sic.) *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 146, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "A sufficiency assignment of error challenges the legal adequacy of the state's prima facie case, not its rational persuasiveness." *State v. Anderson*, 4th Dist. Highland No. 18CA14, 2019-Ohio-395, ¶ 13. "That limited review does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Musacchio v. United States*, ___ U.S. ___, 136 S.Ct. 709, 715, 193 L.Ed.2d 639 (2016), quoting *Jackson* at 319.

**{¶33}** In determining whether a conviction is against the manifest weight of the evidence,

> we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. In order to satisfy this test, the state must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt.
>
> Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. However, we are reminded that generally, it is the role of the jury to determine the weight and credibility of evidence. " 'A jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it.' " *State v. Reyes-Rosales*, 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338, ¶ 17, quoting *State v. West*, 4th Dist.

> Scioto No. 12CA3507, 2014-Ohio-1941, ¶ 23. We defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility.

(Citations omitted.)  *Anderson* at ¶ 14-15.

**{¶34}** R.C. 2903.01(A) states:  "No person shall purposely, and with prior calculation and design, cause the death of another * * *."  "The phrase 'prior calculation and design' by its own terms suggests advance reasoning to formulate the purpose to kill."  *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 18.  "Evidence of an act committed on the spur of the moment or after momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death."  *Id.*  "There is no bright-line test to distinguish between the presence or absence of prior calculation and design; each case depends upon its own facts."  *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 319, citing *Walker* at ¶ 19.  However,

> [t]hree factors have traditionally been considered in determining whether prior calculation and design exists: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?' "

*Id.*, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997), quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976).

**{¶35}** The state introduced evidence from which any rational trier of fact could have found prior calculation and design proven beyond a reasonable doubt, and in resolving conflicts in the evidence, the jury did not clearly lose its way and create such a manifest miscarriage of justice that reversal of the aggravated murder conviction is

necessary.   There is evidence that Moore and Crank knew each other and had a strained relationship.  In the past, Crank had stolen from Moore, and Moore had called the police about stolen property Crank had brought to Moore's property.   Although Moore testified that he had no hard feelings toward Crank and offered him the Davis transmission job the day of the shooting, Moore told Davis that he did not like being around Crank.  Moore also did not like Crank's plan to take control of Dishman's house. The night of the shooting, Moore told Schwab that some people planned to move into the house, and it was "gonna be a bad deal—Fred has something to do with it to [sic]," and Moore told Detective Bollinger about how Moore had secured the house and "now this fucktard thinks he's coming out here telling me he's going to do all this stuff."

**{¶36}** Although there is no evidence that Moore acquired his firearm for the purpose of killing Crank, there is some evidence that Moore gave thought to using the firearm as the murder weapon.  During the first attack on the jeep, Moore touched the firearm.  During the second attack, he unholstered the firearm but kept it hidden by his side.  And during the third attack, he took time to adjust the holstered weapon before the shooting.  Although Moore suggests that he would not have planned to murder someone on his property because it was under surveillance, Moore told Detective Bollinger he did not know whether his cameras were recording and testified that he had never reviewed recorded footage on his DVR system before.

**{¶37}** Evidence supports the prosecution's theory that Moore did not kill Crank during an instantaneous eruption of events but rather facilitated the attacks on the jeep so that he could kill Crank and claim self-defense.  Although Moore denied giving Crank permission to hit the jeep, Moore gave Crank the baseball bat and later gave him the

pry bar even though Crank had already attacked the jeep two times and allegedly threatened Moore's life. Moore went to get Crank a beer while Crank went to his own vehicle, evidently to put on gloves to prepare for the third attack on the jeep with the pry bar. Moore admitted that Crank never came at him with the bat, and the jury was free to agree with the prosecution that when Moore fired the first shot, Crank was not coming toward Moore. That conclusion is consistent with the video footage showing that while Moore is in front of the jeep, Crank is hitting the area by the driver's side door handle with the pry bar, lowers the bar toward the ground, and appears to put a hand to his chest. In addition, Moore's post-shooting actions are consistent with him having a plan to kill Crank and claim self-defense. Although Moore suggested that he was not thinking clearly after the shooting because he was impaired and in shock, he had the presence of mind to move evidence and give Detective Bollinger false information about what happened which was consistent with the altered evidence and favorable to a self-defense claim.

{¶38} Based on this evidence, the jury could reject the defense's theory that Crank was suicidal and tried to provoke Moore into shooting him and conclude that Moore engaged in studied consideration of the method and the means used to cause Crank's death. The aggravated murder conviction is supported by sufficient evidence and is not against the manifest weight of the evidence. Accordingly, we overrule the second assignment of error.

## V.  CONCLUSION

**{¶39}** Having overruled the assignments of error, we affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Lawrence County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.:  Concur in Judgment and Opinion.


For the Court


BY: _____
          Michael D. Hess, Judge


### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**