[Cite as *State v. Hodgson*, 2021-Ohio-4374.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- v -

BRANDON R. HODGSON,

        Defendant-Appellant.

CASE NO. 2021-L-022

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2020 CR 000840

## O P I N I O N

Decided: December 13, 2021
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor, and *Teri R. Daniel*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Sean P. Martin*, 113 North Chestnut Street, Suite A, Jefferson, OH 44047 (For Defendant-Appellant).

MARY JANE TRAPP, P.J.

{¶1} Appellant, Brandon R. Hodgson ("Mr. Hodgson"), appeals from the judgment of the Lake County Court of Common Pleas, which sentenced him to a total prison term of 28 to 32 years after he was found guilty by a jury on six counts of felonious assault. Mr. Hodgson and the four victims were homeless and residing in a "tent city," or homeless encampment, on private property in Painesville, Ohio. The charges arose from a violent altercation at the campsite.

{¶2} Mr. Hodgson raises six assignments of error on appeal, contending that (1) the prosecution misstated the law during opening argument, thus prejudicing the jury; (2) the trial court abused its discretion by failing to correct the misstatements; (3) his counsel was ineffective for failing to file a motion for a mistrial based on the misstatements; (4) there was insufficient evidence to sustain his convictions because the state failed to disprove he acted in self-defense due to the contradictory testimony of the witnesses; (5) for similar reasons, the manifest weight of the evidence does not support the jury's verdict; and, lastly, (6) his status as a homeless person precluded a no duty to retreat jury instruction, thus violating the Equal Protection Clauses of the United States and Ohio Constitutions.

{¶3} After a careful review of the record and pertinent law, we find Mr. Hodgson's assignments of error are without merit.

{¶4} First, a review of the prosecutor's alleged misstatements of law, i.e., the prosecutor's discussion of the state's burden on establishing the elements of an offense during voir dire, reveals that simply because the prosecutor did not mention its burden of disproving self-defense does not mean the prosecutor was misstating the law and prejudicing the jury. Even if the prosecutor had misstated the law, the error would be harmless. The trial court instructed the jury before the state's questioning that the court would later instruct them on the applicable law as applied to the facts of the case; and the trial court accurately instructed the jury on the state's burden of proof as to self-defense prior to deliberations. Because Mr. Hodgson raises the same issue under his second and third assignments of error, they necessarily fail for the same reason.

2

{¶5} Fourth, a review of the state's evidence and testimony presented at trial reveals the state introduced sufficient evidence from which a jury could find Mr. Hodgson did not act in self-defense, i.e., there was sufficient evidence from which a jury could find that Mr. Hodgson was at fault in creating the situation, that he did not have reasonable grounds to believe he was in immediate danger of death or great bodily harm, and/or that he did not use reasonable deadly force. That there was contradictory evidence goes to the manifest weight of the evidence and the credibility of the witnesses.

{¶6} Likewise, Mr. Hodgson's fifth assignment of error is without merit since the manifest weight of the evidence more than supports the jury's verdict. That there was inconsistent testimony among the victims and competing versions of events goes to the credibility of the witnesses and whom the jury choose to believe.

{¶7} Lastly, Mr. Hodgson failed to allege an equal protection violation, i.e., his status as a homeless person did not preclude a "no duty to retreat" or Castle Doctrine jury instruction pursuant to former R.C. 2901.09. Rather, such an instruction would have been inappropriate under the factual circumstances of this case. Quite simply, Mr. Hodgson was nowhere near his "residence" when the violent altercation occurred.

{¶8} The judgment of the Lake County Court of Common Pleas is affirmed.

### Substantive and Procedural History

{¶9} After the case was bound over from the Painesville Municipal Court, Mr. Hodgson was indicted by a grand jury on twelve counts: four counts of attempted murder, a first-degree felony, in violation of R.C. 2903.02(A) (Counts 1, 4, 7, 10); four counts of felonious assault, a second-degree felony, in violation of R.C. 2903.11(A)(1) (Counts 2,

3

5, 8, 11); and four counts of felonious assault, a second-degree felony, in violation of R.C. 2903.11(A)(2) (Counts 3, 6, 9, 12).

{¶10} Mr. Hodgson pleaded not guilty at his arraignment, and the case proceeded to a three-day jury trial.

### The Jury Trial

{¶11} The evidence and testimony at trial revealed that Mr. Hodgson and the four victims, Tina Rothschuh ("Ms. Rothschuh"); Timothy John Wizniak ("Mr. Wizniak"), Dylan Hulderman ("Mr. Hulderman"), and William King ("Mr. King"), were residing in a homeless encampment along with another individual, Mark Zimba, in the wooded area of a private property near Route 20 in Painesville, Ohio, allegedly with the permission of the owner. Another individual, David Kline ("Mr. Kline"), also visited the campsite. Nearby to the encampment is a Marathon gas station, a state of Ohio E-check facility for vehicle emissions, and the Sub Zero Mission.

{¶12} At trial, Mr. Hodgson explained that he became homeless when his construction job ended due to the winter season. He lost his apartment and "pretty much everything at that time." He stayed at Project Hope, a homeless shelter in Painesville, Ohio, in late June/early July and then resided in Recreation Park, a city park in Painesville. During his time at Project Hope, Mr. Hodgson became employed by a Subway in Painesville as a general manager. Toward the end of July, Mr. Hodgson decided to relocate his tent and asked several homeless acquaintances about possible locations. Mr. Wizniak invited Mr. Hodgson to stay at the encampment a few weeks prior to the incident.

4

Case No. 2021-L-022

{¶13} At the campsite, each person had their own tent, with the exception of Ms. Rothschuh and Mr. Wizniak, who shared a tent. The tents were set around a firepit, which was considered the common area or "living room." Mr. Hodgson set up his tent on a different path, away from the others and the campfire, which Ms. Rothschuh described as "a one minute walk away from the campsite within hearing distance."

{¶14} Several days before the incident, the victims and Mr. Hodgson began quarreling over Mr. Hodgson's lost cell phone. Ms. Rothschuh loaned him her cell phone, which Mr. Hodgson held "hostage" until his was found. In response, the victims allegedly threatened him, causing him to fear for his life on several occasions. Several days later, the situation culminated into a violent altercation in which Mr. Hodgson used a rusty saw and a broken rake to strike and maim the victims.

### The State's Case in Chief

{¶15} The stated presented the testimony of eleven witnesses, including the four victims, as well as photographs of the victim's injuries, an aerial map, and a taped police interview with Mr. Hodgson.

{¶16} On the night of the incident, at approximately 11:50 p.m., Joshua Donaldson ("Mr. Donaldson") was driving home from work, heading northeast on Rt. 20. As he approached the intersection with Rt. 2, he saw a woman running from the woods. He slammed on his brakes and observed the woman, later identified as Ms. Rothschuh, panicking and screaming, drenched in blood. Ms. Rothschuh was screaming that "other people were being attacked by 'Brando,'" and that "it's over a phone." Mr. Donaldson pulled into the Sub Zero Mission parking lot and called 911. He saw Ms. Rothschuh run into the road for more assistance from passing vehicles and a sheriff's deputy arrive on

5

the scene. He also observed another man arrive on foot who claimed to be a victim but appeared unharmed. The man appeared unable to listen to the officer, and the officer ordered him to get on the ground and stop moving.

{¶17} Because there were only four deputies from the Sheriff's Office working on the night of the incident, several different departments in the area were called for assistance. Several officers from the Lake County Sheriff's Office ("Sheriff's Office"), the Painesville Police Department, and the Perry Village Police testified as to the investigation of the incident.

{¶18} Deputy Chris Harvilla ("Dep. Harvilla") of the Sheriff's Office responded to the dispatch. When he arrived on the scene, he noticed a male, later identified as Mr. Hodgson, walking towards him, covered in dried blood on his hands and clothing. He could not discern any other injuries, and while Mr. Hodgson smelled of alcohol, Dep. Harvilla did not observe any other indica of intoxication, i.e., slurred speech, bloodshot glassy eyes, or disheveled clothing. Dep. Harvilla called the Painesville Township Fire Department because there were several injured individuals on the scene. They treated the cut on Mr. Hodgson's finger and released him.

{¶19} Mr. Hodgson informed Dep. Harvilla that he had gotten into an altercation with other individuals in the woods and that "he thought he hurt them bad," further stating that "he had used a stick and a saw." Dep. Harvilla transported Mr. Hodgson to the Sheriff's Office. While waiting for the detectives to interview him, Mr. Hodgson divulged that the incident was "over a cell phone"; he thought someone had taken it; and he used "a stick and a bottle" on the victims. He did not know where he hit the victims because it

6

was very dark. Dep. Harvilla further testified that Mr. Hodgson related that "Tim was trying to get up and [I] kept on hitting him."

{¶20} Mr. Hodgson also disclosed that he used a saw, which prompted Dep. Harvilla to relay to the officer at the scene to search for the weapon. He further stated multiple times that he had been attacked by four different people in the woods; he thought "a guy would kill him"; he was "in fear of his life"; the attack was in "self-defense"; and he was "horrified."

{¶21} Mr. Hodgson returned to the scene later the next morning with Dep. Harvilla and several other officers to look for the saw blade, which was located approximately fifteen minutes into the search and found where Mr. Hodgson had described throwing it in the woods.

{¶22} When Lieutenant Kevin Raico ("Lt. Raico") of the Sheriff's Office responded to the scene, he observed several individuals attending to Ms. Rothschuh, who had a large laceration across her face. Her nose appeared to be "hanging down" or cut away from her face, and her face and clothing were covered in blood. While Lt. Raico was attempting to treat her, he observed a male walking towards him holding his neck. Not knowing if this was a potential subject coming out of the woods, he ordered him to the ground. At that point, the male, later identified as Mr. King, reported he had also been assaulted. He removed his hand from his neck, revealing a large laceration on the left side of his neck in the lower jaw area.

{¶23} Hearing someone screaming for help in the woods, Lt. Raico, accompanied by several officers, began searching the woods. When they reached the campsite, he observed four tents surrounding an unlit firepit. One of the tents was stained with blood

7

Case No. 2021-L-022

and another was collapsed with an area of blood stains. There was also a large pile of beer cans nearby. Lt. Raico located a third victim, Mr. Wizniak, sitting in a chair at the campsite with blood "pouring off his face and neck." Three partial pieces of a wooden stick or rake handle that appeared to have fresh blood on them were collected as evidence.

{¶24} When Deputy Shane Hop ("Dep. Hop") of the Sheriff's Office arrived on the scene, he observed an individual, later identified as Mr. Hulderman, "fall" out of the woods. He had blood on the top of his head and on his left arm. Upon closer examination, it appeared that a blunt object had struck him on the top of his head, which had "split" or lacerated. He also had a laceration on his left arm and elbow. Later, Dep. Hop observed Mr. Wizniak covered in blood in the emergency room at Tri-point Hospital. His neck was lacerated, and he was eventually life-flighted by helicopter to MetroHealth Hospital. David Greene, the firefighter paramedic at the scene, observed that Mr. Wizniak's ear appeared to have been sliced with only the top still attached. Mr. Wizniak indicated he could not hear.

{¶25} Deputy Michael Zgrebnak ("Dep. Zgrebnak") was one of the officers who assisted with the investigation of the campsite. He assisted Mr. Wizniak in walking out of the woods and noticed he had a strong odor of alcohol emanating from his person.

{¶26} Detective Corey Svagerko ("Det. Svagerko") from the Sheriff's Office, who investigated the incident and interviewed Mr. Hodgson, testified that three pieces of a wooden handle, similar to a rake, were found at the campsite. He also found two broken glass bottlenecks and a piece of glass at the scene. He retrieved a burned phone from the firepit, which appeared to match the description of Ms. Rothschuh's phone. Two other

8

phones were found near the campsite, but neither matched the model/make of Mr. Hodgson's lost phone.

{¶27} During the police interview, Mr. Hodgson admitted that he used a saw on the victims and that he broke two bottles over Mr. Wizniak's head. He also claimed Mr. Wizniak attempted to attack him with a burning branch from the fire. Det. Svagerko testified that the only "branch" located at the campsite was a 10- to 12-foot log that could not easily be wielded as a weapon. The only injury he observed on Mr. Hodgson was a small cut on his thumb.

### The Victims' Testimony

{¶28} All four victims testified at the trial.

{¶29} Ms. Rothschuh testified that Mr. Hodgson had been residing at the campsite for several weeks prior to the incident and that everyone "got along great." Approximately a week before the "attack," Mr. Hodgson discovered his phone was missing. Mr. Hulderman told Ms. Rothschuh and Mr. Hodgson that he had borrowed the phone to listen to music, but when it ran out of batteries, he set it down on a cinder block by the firepit. It was gone in the morning. They speculated that Mr. Kline, who sometimes visited the campsite, had taken the phone.

{¶30} Mr. Wizniak offered Ms. Rothschuh's phone to Mr. Hodgson to use when he went to work. She attempted to retrieve the phone from Mr. Hodgson with Mr. Wizniak at the Subway shop where Mr. Hodgson worked. Mr. Hodgson refused and told her he would return it when "he got his phone back." Mr. Hodgson reported their visit to the police, but he returned the phone to Ms. Rothschuh when he returned to the campsite later that evening.

9

{¶31} Ms. Rothschuh depicted the scene prior to the incident and testified that everyone was drinking and sitting by the campfire when Mr. Hodgson returned from work, with food and beer to share. Everyone (Mr. Hodgson and the four victims) was listening to music. Mr. King and Ms. Rothschuh returned to their respective tents while the others were discussing putting Mr. Hodgson's air mattress into Mr. Hulderman's tent. As Ms. Rothschuh did so, she heard Mr. Wizniak begin yelling, "Ow, why are you hitting me." She got out of the tent and saw Mr. Wizniak coming towards her, holding his ear. He crawled into the tent and, as she was attempting to find clothes to stop the blood flow, Mr. Hodgson started hitting Mr. Wizniak with a broken-off stick. Mr. Hodgson told her to get back into the tent. He retrieved a rusty saw they kept at the campsite to cut firewood, hit Mr. Wizniak in the back, and "raked his neck." Mr. Wizniak "went down and laid here on the ground."

{¶32} Ms. Rothschuh testified that at one point, Mr. Hodgson "reminded me that he was demising our murders. He said I told you I was demising your murders, he says it's too late, he says you're dead, you're all dead." "And then, you know I was still trying to plead with him, he shined a light in my face and he whacked me in the face with the saw." Ms. Rothschuh stated that she was in shock and decided to run to the road to get help. Ms. Rothschuh did not see Mr. Hodgson attack Mr. Hulderman or Mr. King, nor did she actually observe Mr. Hodgson attacking Mr. Wizniak with the stick.

{¶33} Mr. Wizniak described the morning before the incident for the jury. Officers from the Sheriff's Office appeared at the campsite. Mr. Wizniak led them to Mr. Hodgson's tent where he was sleeping. The officers were responding to a report Mr. Hodgson had made the day before regarding the verbal exchange at the Subway shop in which he felt

10

threatened when he refused to return Ms. Rothschuh's phone. Mr. Wizniak explained to the officers that he had a friend stay the night, Mr. Kline, and that he had last seen the phone or "tablet" on one of the cinder blocks by the campfire.

{¶34} Mr. Wizniak testified that later that night he was intoxicated and at some point called Mr. Hodgson a derogatory, sexually-oriented slur. Mr. Hodgson appeared angry, and as Mr. Wizniak turned to walk away, Mr. Hodgson struck him with what Mr. Wizniak believed was a "a log on the side of my head." He heard Ms. Rothschuh yelling and "felt the saw and blood" before he passed out. Mr. Wizniak has permanent damage to his right eye and ear from the attack. His retina detached from his left eye during the attack, which has since been repaired. Mr. Wizniak further testified that he did not remember going into the Subway shop to retrieve Ms. Rothschuh's phone from Mr. Hodgson or what happened to Mr. Hulderman and Mr. King on the night of the incident.

{¶35} Mr. Hulderman testified that when Mr. Hodgson discovered his phone was missing, he and Mr. Wizniak walked to Painesville to find Mr. Kline's tent to question him. They were unsuccessful. Later that night Mr. Hodgson returned to the campsite with beer and possibly some food to share.

{¶36} On the night of the incident, Mr. Hodgson "flipped out" after Mr. Wizniak repeatedly apologized that Mr. Hodgson's phone was stolen. Mr. Hodgson proceeded to destroy Mr. Wizniak's tent, grabbed a stick, "twirled it like a baton," and smacked Mr. Wizniak with it on the left side of his head. Mr. Hulderman testified that neither he nor Mr. Wizniak ever had a stick in their hands. Mr. Hodgson continued to speak angrily to Mr. Wizniak and grabbed the saw, cutting him on the left side of his throat. Mr. Hodgson

11

proceeded to walk around hitting everybody on the head, while he decided "who he was going to do next."

{¶37} After Mr. Hodgson attacked Ms. Rothschuh and Mr. King, he approached Mr. Hulderman, who attempted to block Mr. Hodgson with his hand and elbow. Mr. Hulderman picked up a red camp chair and blocked him. Mr. Hulderman received staples and stiches. He never heard anyone threaten Mr. Hodgson, and he never observed Ms. Rothschuh or Mr. King "with anything in their hands."

{¶38} Mr. King testified that he was sleeping in his tent when he heard Mr. Hodgson and Mr. Wizniak arguing over whether Mr. Wizniak stole Mr. Hodgson's phone. He heard Mr. Wizniak scream in pain, the sound of "another whack," and Mr. Hulderman tell Mr. Hodgson to stop hurting Mr. Wizniak. He heard Mr. Hodgson reply that Mr. Hulderman was next. Mr. King decided he had to try to get help. As soon as he unzipped his tent, Ms. Rothschuh fell on him, screaming that Mr. Hodgson cut her face. Mr. Hodgson warned Mr. King to stay in his tent. When he thought he heard Mr. Hodgson retreating, he left the tent. Mr. Hodgson flashed a light in Mr. King's face and cut his throat with a saw. Mr. King was transported to TriPoint Hospital, and his throat was stitched together after a CT scan revealed no arteries had been severed.

### The Defense

{¶39} The defense presented the testimony of six witnesses, including Mr. Hodgson.

{¶40} Mr. Hodgson's coworker from the Subway shop, Kelsey Rigo ("Rigo"), testified that three individuals were in the restaurant threatening Mr. Hodgson on the day

12

Case No. 2021-L-022

Mr. Wizniak and Ms. Rothschuh attempted to retrieve Ms. Rothschuh's phone from Mr. Hodgson. Rigo recalled Mr. Hodgson appeared a bit irritated or angry.

{¶41} Officer Sean Stone ("Officer Stone") and Officer Kyle Sukys ("Officer Sukys"), Painesville police officers, responded to a disturbance at the Subway shop at approximately midday on August 22, 2020. After speaking with Mr. Hodgson, Officer Stone referred Mr. Hodgson to the Sheriff's Office and explained the steps to obtain a protection order. The officers located Mr. Wizniak, Ms. Rothschuh, and Mr. Kline near St. James Church, and Officer Sukys spoke with Ms. Rothschuh.

{¶42} Mr. Hodgson testified that on the day he moved to the campsite he was sitting in his tent watching TV on his phone. Hearing voices in the woods, he noticed people with flashlights. As he unzipped his tent to speak to them, Mr. Wizniak held a gun to his face. The victims started laughing and sat down to drink alcohol, explaining it was "just a pellet" or "air gun." Later, Mr. Wizniak and Mr. Kline got into a loud verbal altercation. Mr. Hodgson spent most of his time at work during the time he lived at the campsite. Approximately three or four days before his phone was taken, the other individuals discovered he was gay.

{¶43} On the night his phone was taken, he was drinking alcohol around the campfire with the four victims. Mr. Hodgson loaned Mr. Hulderman his phone when he retired to his tent for the night. When he awoke in the morning, it was missing. He confronted the victims, who denied the theft and blamed it on Mr. Kline. Several days later, he was with Mr. Wizniak in downtown Painesville. Mr. Wizniak saw Mr. Kline and confronted him. Afterward, he relayed to Mr. Hodgson that Mr. Kline denied taking the phone and that Mr. Wizniak believed him.

13

{¶44} In reference to Ms. Rothschuh's phone, Mr. Hodgson testified that he "got an idea in [his] head * * * to tell [Mr. Wizniak] that this phone now belongs to him and until you [Mr. Wizniak] find mine I'm not returning this one." He admitted he was trying to pressure and threaten the victims, i.e., "to file police reports, stuff of that nature," in order to get his phone back.

{¶45} Mr. Hodgson also testified as to the Subway shop incident, recalling that Mr. Wizniak appeared during his Sunday shift to retrieve Ms. Rothschuh's phone. Mr. Hodgson refused, and Mr. Wizniak threatened him. After Mr. Wizniak walked out of the restaurant, Mr. Kline walked in and threated him. Mr. Hodgson called the Painesville Police Department, who responded to the scene. He filed an incident report with the Sheriff's Office, which detailed the threats made at the restaurant, that he was in fear for his life, the missing cell phone, and listed his mother's cell phone number as a contact.

{¶46} That night Mr. Hodgson apologized to Ms. Rothschuh and returned her phone. In the morning the Sheriff's Office responded to the incident report and spoke to Mr. Hodgson and the four victims, who reiterated that Mr. Kline was responsible for the theft. Mr. Hodgson visited his mother soon afterward, borrowing some money and her SafeLink cellphone. After visiting a friend and the Subway shop, Mr. Hodgson returned to the campsite in the evening with a six-pack of beer, which he offered to the victims. At some point, he and Mr. Wizniak walked to the RediGo store and purchased more beer and some food.

{¶47} When they returned to the campsite, Mr. Wizniak repeatedly mentioned the missing cellphone. Ms. Rothschuh and Mr. Hulderman were in the woods collecting firewood. Mr. Hodgson told him to "shut the f*@# up." Mr. Wizniak responded by calling

14

Mr. Hodgson a "f@##&t" and picked up a burning, three-foot branch from the fire, swinging it at Mr. Hodgson. Mr. Hodgson picked up a glass bottle and hit Mr. Wizniak over the head. Mr. Wizniak stumbled backward and came forward again with the branch. Mr. Hodgson grabbed another glass bottle and broke it over Mr. Wizniak's head. At that point, Ms. Rothschuh ran out of the woods at Mr. Hodgson with a stick in her hand. Mr. Hodgson picked up the saw and hit her to defend himself. Mr. Wizniak and Mr. Hodgson continually yelled at each other "to stop it." Mr. Hodgson denied having a flashlight in his hands.

{¶48} After Mr. Hodgson hit Ms. Rothschuh with the saw, he struck Mr. Wizniak because he was still swinging a branch at him. While Mr. Wizniak was swinging the branch at him, Mr. Hodgson heard Mr. Hulderman approach him from behind with a chair in his hand. Mr. Hodgson also swung at Mr. Hulderman, who managed to knock the saw out of Mr. Hodgson's hand with the chair. Mr. Hodgson grabbed a broken rake that was propped against a tree and, holding the metal end, came into contact "with something" as he swung, breaking the rake. He swung it again, perhaps hitting Mr. Wizniak in the head, breaking the rake a second time. He threw the remaining piece of the rake in his hand to the ground.

{¶49} Mr. Hulderman and Mr. Wizniak continued to approach him with a chair and a stick, respectively. Mr. Hodgson reached for the saw and began striking Mr. Hulderman with it. Mr. King appeared from his tent. Mr. Hodgson believed he was going to attack him and struck him once with the saw. Mr. King ran away into the woods. Mr. Hodgson testified that he realized later that Mr. King might not have been trying to attack him but may have been attempting to access the path Mr. Hodgson was blocking.

Case No. 2021-L-022

{¶50} Mr. Hodgson further testified that he was trying to back away the entire time but was unable to retreat because he was being attacked by the victims. Mr. Hodgson finally turned and ran through the woods to the Marathon gas station to call the police, testifying, "I needed to get help because I didn't know if I'd be attacked further and I was just using a saw on four people." He threw the saw approximately 20 feet before he exited the woods. Mr. Hodgson described his fear as he was attacked by multiple people to the jury.

### Self-Defense Jury Instruction

{¶51} Throughout the trial, the state and the defense disputed whether the duty to retreat jury instruction was applicable to Mr. Hodgson's defense of self-defense in two respects. The first issue, and relevant to this appeal, was whether Mr. Hodgson had no duty to retreat because the campfire was the common area of his "residence," thus implicating the so-called Castle Doctrine. Pursuant to the former version of R.C. 2901.09 and the definitions of "residence" and "dwelling" in R.C. 2901.05(D)(2) and (3), the trial court determined that the campfire was not a part of Mr. Hodgson's residence; therefore, he had a duty to retreat. Defense counsel objected for the record. The second issue dealt with the inverse jury instruction that Mr. Hodgson had a duty to retreat before he used deadly force.

{¶52} Ultimately, the jury was not given the Castle Doctrine/no duty to retreat instruction and was instructed on the duty to retreat: "if [Mr. Hodgson] (A) was at fault in creating the situation giving rise to the event which occurred on or about August 24th, 2020; or (B) did not have reasonable grounds to believe and an honest belief that he was

16

Case No. 2021-L-022

in imminent or immediate danger of death or great bodily harm; or (C) had a reasonable means of escape from that danger other than by means of deadly force."

### The Jury's Verdict

{¶53} The jury found Mr. Hodgson guilty on six counts of felonious assault (Counts 2, 3, 5, 6, 9, and 12) and not guilty on the counts of attempted murder (Counts 1, 4, 7, and 10) and on two counts of felonious assault (Counts 8 and 11).

### Sentencing

{¶54} At the sentencing hearing, the trial court found that Count 2 merged into Count 3 (felonious assault in violation of R.C. 2903.11(A)(1)) and that Count 5 merged into Count 6 (felonious assault in violation of R.C. 2903.11(A)(2)) for purposes of sentencing.

{¶55} The trial court sentenced Mr. Hodgson to a prison term of a minimum of eight years and a maximum of 12 years on Count 3, eight years on Count 6, six years on Count 9, and six years on Count 12, to be served consecutive to each other, for a total prison term of a minimum of 28 years to a maximum of 32 years.

{¶56} Mr. Hodgson raises six assignments of error on appeal:

{¶57} "[1.] The prosecution misstated law during the opening argument which prejudiced the Appellant.

{¶58} "[2.] Trial Court abused its discretion by failing to correct the State of Ohio's incorrect statement during opening arguments.

{¶59} "[3.] Appellant received Ineffective Assistance of Counsel as Trial Counsel failed to Motion for a Mistrial Due to the State of Ohio's Improper Statements During Opening Arguments.

17

Case No. 2021-L-022

{¶60} "[4.] The State of Ohio Failed to Produce Legally Sufficient Evidence to Sustain a Conviction of the Appellant.

{¶61} "[5.] Appellant's Convictions Fell Against the Manifest Weight of the Evidence.

{¶62} "[6.] Appellant was entitled to the Castle Doctrine despite his status as a homeless person."

### Prosecutorial Misconduct

{¶63} In his first assignment of error, Mr. Hodgson contends the prosecutor prejudiced the jury against him by misstating the law during opening statements. More specifically, Mr. Hodgson argues the prosecutor confused the jury when it explained that the state needs to prove the elements of the crime beyond a reasonable doubt and that all other matters are "collateral matters." Crucially, he asserts the prosecutor failed to mention that the burden of proof was on the state to disprove Mr. Hodgson acted in self-defense, a matter that is more than "collateral."

{¶64} The conduct of a prosecutor during trial is not grounds for error unless it deprives a defendant of a fair trial. *State v. Maurer*, 15 Ohio St.3d 239, 266, 473 N.E.2d 768 (1984); *State v. Anderson*, 11th Dist. Portage No. 2008-P-0002, 2008-Ohio-6413, ¶ 35. The test for prosecutorial misconduct is whether the alleged remark was improper and, if so, whether it prejudicially affected the substantial rights of the defendant. *State v. Smith*, 87 Ohio St.3d 424, 442, 721 N.E.2d 93 (2000). In reviewing allegations of prosecutorial misconduct, it is our duty to consider the conduct in the context of the entire trial. *See Darden v. Wainwright*, 477 U.S. 168, 183, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), fn. 15. Additionally, we recognize that an isolated comment, albeit improper, will

18

not constitute reversible error if it does not deprive the defendant of a fair trial. *See State v. Jenkins*, 11th Dist. Trumbull No. 2006-T-0058, 2007-Ohio-4227, ¶ 54.

{¶65} At the outset, we must note that the prosecutor's remarks occurred during voir dire before jury selection was completed, not during opening statements. During voir dire, the prosecutor explained the standard of beyond a reasonable doubt and further expounded:

{¶66} "Now what are we proving beyond a reasonable doubt? We're proving the elements of the offenses and that they are kind of like LEGOS, you have like building blocks and then you build them up and then you have your offense, okay. So the State of Ohio has to prove all those elements beyond a reasonable doubt but what's important to understand is that the State of Ohio only has to prove the elements of the offenses, okay. We don't have to prove everything we have to prove only the elements of the offenses.

{¶67} "What am I talking about here? We don't have a burden to collateral matters so let's talk about motive.

{¶68} "* * *

{¶69} "We're only here to determine the elements of the offenses; does everybody understand the state doesn't have a burden to collateral matters?"

{¶70} Defense counsel's objection was overruled.

{¶71} The state reiterated, "Does everybody understand that the state only has a burden on only the elements of the offenses under the law? Number 3, you look a little confused."

19

Case No. 2021-L-022

{¶72} Thus, a review of the above excerpt reveals Mr. Hodgson's argument is wholly inaccurate and taken out of context. "'[S]horthand references to legal concepts during voir dire cannot be equated to final instructions given shortly before the jury's * * * deliberations.'" *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 151, quoting *State v. Stallings*, 89 Ohio St.3d 280, 285, 731 N.E.2d 159 (2000).

{¶73} In *Beasley*, the Supreme Court of Ohio found that counsel was not ineffective for failing to object when the trial court omitted the phrase "beyond a reasonable doubt" when discussing the process of weighing aggravating circumstances against mitigating factors during voir dire. *Id*. at ¶ 151. The trial court gave correct instructions of the law before the mitigation hearing began and before deliberations, which cured any earlier misstatement. *Id.*

{¶74} Similarly in this case, the prosecutor's statements regarding the burden of proving the elements of a crime were taken out of context. The prosecutor was questioning the jurors' understanding of proving a crime "beyond a reasonable doubt" on each element of the offense. The prosecutor used motive as an example of a "collateral matter" that is often not an element of an offense that needs to be proved.

{¶75} The prosecutor's statements were also preceded by the trial court's voir dire introductory statements instructing the jurors that "[l]ater, the Court will furnish the law which you will apply to the facts" and that "the evidence does not include the indictment or the opening statements or closing arguments of counsel. The opening statements and closing arguments of counsel are designed to assist you. They are not evidence." When the trial court was finished questioning the jury, before turning voir dire over to the parties, it again instructed the jury that "[s]ince it would be your duty to decide the case based

20

solely on the evidence as it's later defined for you, you must not consider any evidence, any statement or act as evidence, any statement or act of the attorneys during the trial including voir dire." In addition, during its questioning of the jurors, defense counsel informed the jury that the trial court will instruct them on the applicable law and "talk to you about self-defense."

{¶76} Finally, and most fundamentally, the trial court properly instructed the jury as to the state's burden of proof as to the elements of the crime and the defense of self-defense prior to deliberations.

{¶77} Our court and other courts have found that similar "misstatements" that occurred during voir dire did not result in a substantial prejudice that affected the outcome of the trial because the jury was not yet impaneled and evidence was not yet introduced. For example, in *State v. Daniel*, 11th Dist. Trumbull No. 89-T-4214, 1990 WL 237188 (Dec. 31, 1990), we found no misstatements of law in regard to the prosecutor's statements regarding accomplice culpability using hypothetical examples. *Id.* at *5. We found the jurors were clearly instructed prior to voir dire that the questions were not evidence and were similarly instructed as to opening statements and closing arguments. *Id.* Further, the trial court instructed the jury on the law, thus curing any possible misconceptions the jurors may have had from the prosecutor's examples. *Id.* The jury also acquitted the appellant of aggravated murder and found him guilty of the much lesser offense of involuntary manslaughter, which was in his favor. *Id.* Finally, given the overwhelming evidence of the appellant's guilt, any such misconception or error would constitute harmless error. *Id.* at *6.

21

{¶78} Likewise in *State v. Myers*, 2d Dist. Darke No. 1643, 2006-Ohio-1604, the Second District determined that various misstatements of law by the trial court and the prosecutor during voir dire were not prejudicial where the jury was repeatedly instructed as to the proper law, including in the final jury instructions. *Id. at* ¶ 20-21. In another case, *State v. Casey*, 2d Dist. Miami No. 19940, 2004-Ohio-1017, defense counsel was found not ineffective for failing to object to the prosecutor's misstatements during voir dire where defense counsel addressed the misstatements, the trial court instructed the jury on the state's burden of proof at the beginning and the end of the trial, and evidence of the appellant's guilt was overwhelming. *Id.* at ¶ 59-60.

{¶79} In *State v. Stevens*, 2016-Ohio-446, 58 N.E.3d 584 (3d Dist.), the Third District determined that even if the prosecutor's statements were improper, the appellant failed to show that a reasonable probability exists that but for the statements, the result of trial would have been different. *Id.* at ¶ 56. Further, the improper remarks occurred during voir dire, which was before the jury had been impaneled and evidence was introduced. *Id.; see State v. Heller*, 10th Dist. Franklin No. 01AP-648, 2002 WL 338143, *5 (Mar. 5, 2002).

{¶80} Turning to the case at hand, Mr. Hodgson failed to prove that the prosecutor's omission of discussing the state's burden on self-defense when explaining the state's burden of establishing elements of an offense were "misstatements" and that a reasonable probability exists that but for the statements, the outcome of his trial would have been different. The statements occurred before the jury was impaneled and evidence was introduced, and the court accurately instructed the jury before deliberations on the state's burden on self-defense.

22

{¶81} Mr. Hodgson's first assignment of error is without merit.

## Prosecutorial Misstatements

{¶82} In his second and third assignments of error, Mr. Hodgson further challenges the prosecutor's "misstatement of the law," albeit under the guise of (1) whether the trial court abused its discretion in overruling defense counsel's objection to the prosecutor's remarks, and (2) whether defense counsel was ineffective for failing to file a motion for a mistrial based on the prosecutor's misstatement of law.

{¶83} Because we found Mr. Hodgson's first assignment of error to be without merit, we necessarily find that the trial court did not abuse its discretion in its ruling on the objection and that defense counsel was not ineffective. *See State v. Butler*, 11th Dist. Ashtabula No. 2000-A-0057, 2001 WL 935476, *5 (Aug. 17, 2001).

{¶84} Thus, Mr. Hodgson's second and third assignments of error are without merit.

## Sufficiency of the Evidence

{¶85} In Mr. Hodgson's fourth assignment of error, he challenges the sufficiency of the evidence as to self-defense. He contends the state did not introduce sufficient evidence to establish beyond a reasonable doubt that he did not act in self-defense. He argues that the victims' testimonies were contradictory because everyone was intoxicated during the incident and Mr. Wizniak's comments to him prior to the ensuing melee were belligerent and threatening. Furthermore, Mr. Hodgson testified that he was in fear for his life multiple times; he was forced to stay at the homeless encampment due to COVID and the local homeless shelter's policies; and finally, he was forced to defend himself against multiple attackers.

23

Case No. 2021-L-022

{¶86} It appears from Mr. Hodgson's arguments that he is attacking the manifest weight of the evidence rather than the sufficiency of the state's evidence. Nevertheless, we will address his sufficiency argument under the applicable standard.

{¶87} In *State v. Bunfill*, 7th Dist. Belmont No. 03 BE 14, 2004-Ohio-1199, the Seventh District aptly explained these different standards of review:

{¶88} "[A]rguments concerning the 'sufficiency of the evidence' should not be confused with those addressing the 'manifest weight of the evidence'. *See State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541, at paragraph two of the syllabus ('The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.') 'Sufficiency of the evidence' is "'a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *Id.* at 386, 678 N.E.2d 541, quoting Black's Law Dictionary (6 Ed .1990) [sic] 1433. The relevant inquiry when determining whether the evidence is sufficient to support the verdict 'is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. 'The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of facts.' *Id.* at 273, 574 N.E.2d 492. Whether the evidence is legally sufficient is a question of law. *Thompkins* at 386, 678 N.E.2d 541.

{¶89} "In contrast, when reviewing whether a conviction was against the manifest weight of the evidence, we must 'examine whether the evidence produced at trial "attains

24

the high degree of probative force and certainty required of a criminal conviction.'" *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 163, 749 N.E.2d 226, quoting *State v. Getsy* (1998), 84 Ohio St.3d 180, 193, 702 N.E.2d 866. In order to do this, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the fact-finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* '"Weight is not a question of mathematics, but depends on its effect in inducing belief."' (Emphasis sic.) *Thompkins* at 387, 678 N.E.2d 541, quoting Black's Law Dictionary (6 Ed.1990) 1594." *Id.* at ¶ 7-8.

{¶90} For purposes of establishing that Mr. Hodgson did not act in self-defense, the state was required to disprove beyond a reasonable doubt at least one of the following (all three of these elements must be present to establish self-defense):

{¶91} Mr. Hodgson (1) was not at fault in creating the situation giving rise to the affray; (2) had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) he did not violate any duty to retreat or avoid the danger. *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002); R.C. 2901.05(B)(1). Consistent with the self-defense requirement that force must be the only means of escape, a person may only use as much force as is reasonably necessary to repel the attack. *State v. Thomas*, 77 Ohio St.3d 323, 326, 673 N.E.2d 1339 (1997); *State v. Oller*, 2017-Ohio-814, 85 N.E.3d 1135, ¶ 61 (10th Dist.).

{¶92} As our review of the facts above indicates, the state presented more than sufficient evidence from which a jury could find Mr. Hodgson did not act in self-defense,

Case No. 2021-L-022

or, conversely, that the state disproved at least one of the three elements of self-defense beyond a reasonable doubt. There was evidence that Mr. Hodgson was at fault in creating the situation giving rise to the affray. For instance, Ms. Rothschuh testified that Mr. Hodgson refused to return her phone and reported them to the police following the Subway shop incident. Mr. Wizniak and Mr. Hulderman testified that Mr. Hodgson grew angry at Mr. Wizniak for verbally insulting him and began attacking him with a stick. None of the victims saw anyone besides Mr. Hodgson with a weapon in his or her hands. As for the attack itself, all four of the victims testified to similar versions of Mr. Hodgson attacking them violently with a stick and a saw to their heads and necks, which was consistent with their extensive injuries. The victims, with the exception of Mr. Wizniak, fled the campsite one by one while Mr. Hodgson was attacking them. Thus, there was evidence from which a jury could find that Mr. Hodgson could have retreated instead of using force and that attacking people with a rusty saw on their heads and necks was not a "reasonable use of force" under the circumstances.

{¶93} That there was contradictory testimony from Mr. Hodgson and a competing version of events does not go to the sufficiency of the evidence and whether the state introduced evidence on each element of the offenses and self-defense, but rather goes to the credibility of the witnesses and the manifest weight of the evidence. Since much of Mr. Hodgson's argument pertains to the manifest weight of the evidence, it is well-settled that when assessing the credibility of witnesses, "[t]he choice between the credibility of witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). Furthermore, "if the

26

evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict." *State v. DeHass*, 10 Ohio St.2d 230, 234, 227 N.E.2d 212 (1967).

{¶94}   Mr. Hodgson's fourth assignment of error is without merit.

**Manifest Weight of the Evidence**

{¶95}   In his fifth assignment of error, Mr. Hodgson contends his convictions for felonious assault are not supported by the manifest weight of the evidence because the victims' testimonies were highly contradictory, three of the victims admitted they never saw how the incident began, all agreed they were intoxicated, and the flashlight the victims alleged Mr. Hodgson flashed in their faces was never found.  Thus, the victims' contradictory testimonies and unverified statements do not support the verdict.

{¶96}   "[W]eight of the evidence addresses the evidence's effect of inducing belief."  *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's?"  *Id.*

{¶97}   "'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶98}   "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a

27

Case No. 2021-L-022

'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.*, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin* at 175.

{¶99} As our review of the facts indicates, there was more than enough evidence to support the jury's verdict. Two of the victims testified that Mr. Hodgson attacked Mr. Wizniak at the campsite after either Mr. Wizniak called him a sexually oriented slur or apologized for the theft of Mr. Hodgson's phone. While there is no doubt that all of the individuals involved had been drinking alcohol and were intoxicated to some extent, the victims' testimonies were consistent with their traumatic injuries and the evidence found by the officers at the campsite. Mr. Hodgson, by his own testimony, stated that he had an idea in his head to "hold Ms. Rothschuh's phone hostage" and intimidate the victims by calling the police several days before the violent altercation. He further testified that he continued attacking Mr. Wizniak once he was on the ground and blocked Mr. King from escaping down the path in the woods. He told the officers who responded to the scene and in the police interview that he attacked four people with a saw and a stick. He also walked away from allegedly being attacked by four people with a mere scratch on this thumb.

{¶100} As we explained in our discussion of Mr. Hodgson's insufficiency of the evidence argument, simply because the victims' testimonies were contradictory in nature goes to their credibility and the jury was free to believe the state's version of the incident. *See Awan* at 123.

28

{¶101} Mr. Hodgson's fifth assignment of error is without merit.

## Duty to Retreat – The Castle Doctrine

{¶102} In his sixth assignment of error, Mr. Hodgson contends he was entitled to a Castle Doctrine jury instruction, i.e., that he had no duty to retreat because he was protecting himself from the victims' attack in his own residence. Thus, he asserts R.C. 2901.05, as applied, violates his right to equal protection under the Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Ohio Constitution by denying him that instruction based on his status as a homeless person.

{¶103} The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall * * * deny to any person within its jurisdiction the equal protection of the laws." The Equal Protection Clause prevents states from treating people differently under its laws on an arbitrary basis. *State v. Williams*, 88 Ohio St.3d 513, 530, 728 N.E.2d 342 (2000), citing *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 681, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (Harlan, J., dissenting). "'Whether any such differing treatment is to be deemed arbitrary depends on whether or not it reflects an appropriate differentiating classification among those affected; the clause has never been thought to require equal treatment of all persons despite differing circumstances.'" *Id.*, quoting *Harper* at 681 (Harlan, J., dissenting).

{¶104} Under the Equal Protection Clause, a legislative distinction need only be created in such a manner as to bear a rational relationship to a legitimate state interest. *Id.*, citing *Clements v. Fashing*, 457 U.S. 957, 963, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982). These distinctions are invalidated only where "'they are based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to

29

justify them.'" *Id.*, quoting *Clements* at 963; *see also*, *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); *Am. Assn. of Univ. Professors, Cent. State Univ. v. Cent. State Univ.*, 87 Ohio St.3d 55, 58, 717 N.E.2d 286 (1999). This rational basis analysis is discarded for a higher level of scrutiny only where the challenged statute involves a suspect class or a fundamental constitutional right. *Id.*, citing *Clements* at 963; *see also Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

{¶105} The former version of R.C. 2901.09(B) provides that "[f]or purposes of any section of the Revised Code that sets forth a criminal offense, a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence, and a person who lawfully is an occupant of that person's vehicle or who lawfully is an occupant in a vehicle owned by an immediate family member of the person has no duty to retreat before using force in self-defense or defense of another."[1]

{¶106} "Residence" has the same meaning as in R.C. 2901.05. R.C. 2901.09(A). R.C. 2901.05(D)(3) defines "residence" as "a dwelling in which a person resides either temporarily or permanently or is visiting as a guest." "Dwelling" means "a building or conveyance of any kind that has a roof over it and that is designed to be occupied by people lodging in the building or conveyance at night, regardless of whether the building or conveyance is temporary or permanent or is mobile or immobile. As used in this division, a building or conveyance includes, but is not limited to, an attached porch, and

---

1. The former version of R.C. 2901.09(B) was effective from September 9, 2008, to April 5, 2021.

30

Case No. 2021-L-022

a building or conveyance with a roof over it includes, but is not limited to, a tent." R.C. 2901.05(D)(2).

{¶107} After defense counsel presented his argument requesting the Castle Doctrine jury instruction, the court stated, "His residence is the tent. It's not the living room with the open skies it's the tent that's down the hill, that's his residence. The sky is not a ceiling. The tent has a ceiling that the sky doesn't." After defense counsel objected, the court again stated, "He's in an open area with a bunch of tents here and a tent way down there." Defense counsel reiterated that "we had everyone testify that where this happened was in the living room." The court replied, "Okay. You can call it, you know you can call it a romper room if you want or the game room, you can call it whatever you want but it ain't a residence or a dwelling, that's the way this [R.C. 2901.05(D)(2) and (3)] is crafted."

{¶108} The trial court found the definition of "dwelling" pursuant to R.C. 2901.05(D)(2) and the factual circumstances of this case controlling. We agree, as applied to this case, Mr. Hodgson's homeless status is irrelevant because the definition of a "dwelling" specifically includes a tent. A shared campfire, however, is excluded pursuant to the statute because it is not "*[a] building or conveyance of any kind that has a roof over it and that is designed to be occupied by people lodging in the building or conveyance at night.*" (Emphasis added.) R.C. 2901.05(D)(2). The campfire is analogous to other areas close to a residence that has not been considered part of a "dwelling." For instance, it has been held that a driveway is not a residence under R.C. 2901.05(D)(3) because it is not a dwelling under R.C. 2901.05(D)(2). *See State v. Moore*, 2020-Ohio-4321, 158 N.E.3d 111, ¶ 28 (4th Dist.). Similarly, after considering the conduct

31

and location of the victim at the time the appellant was claiming to be acting in self-defense, the public street running in front of the appellant's house was not considered a "residence under any plausible interpretation of that term." *State v. Estelle*, 2021-Ohio-2636, --- N.E.3d ---, ¶ 16 (3d Dist.).

{¶109} Quite simply, a no duty to retreat instruction would be inappropriate based on the physical location of the campfire and Mr. Hodgson's tent. The map of the encampment demonstrated that Mr. Hodgson's tent was separate from the rest of the campsite, being located down a small hill and on a different path. Thus, his tent was nowhere near the campfire, and not even an analogous "front porch" argument can be made. For example, in *Moore, supra*, the Fourth District found that R.C. 2901.09(B) did not apply because the appellant was not in his residence when he used force; he voluntarily left his garage, went into the driveway and was several feet from the garage entrance. *Id.* at ¶ 21. Although the appellant attempted to argue the driveway was curtilage, the appellant provided no analysis of the curtilage factors. *Id.* In addition, R.C. 2901.05(D)(2) does not state that a building includes curtilage, only that a building "includes, but is not limited to, an attached porch." *Id.* The appellant did not even attempt to demonstrate his driveway was analogous to an attached porch. *Id.*

{¶110} Mr. Hodgson attempts to argue that a homeless person who seeks shelter under a "highway overpass" would not be in a "dwelling" because it is "not designed for habitation." That situation, however, is not the situation herein, and newly amended R.C. 2901.09 may foreclose the hypothetical equal protection violation Mr. Hodgson is suggesting. Effective April 6, 2021, R.C. 2901.09(B) now states that "[f]or purposes of any section of the Revised Code that sets forth a criminal offense, a person has no duty

Case No. 2021-L-022

to retreat before using force in self-defense, defense of another, or defense of that person's residence if that person is in a place in which the person lawfully has a right to be." So long as the person, whether homeless or not, is in a place the person lawfully has a right to be, whether that be a highway overpass, the person has no duty to retreat before using force to protect oneself, another, or his/her residence. We decline, however, to determine a hypothetical situation that is not presented in this case.

{¶111} Because Mr. Hodgson's status as a homeless person did not preclude the Castle Doctrine jury instruction, the Equal Protection Clause is not implicated in this case. Mr. Hodgson's sixth assignment of error is without merit.

{¶112} The judgment of the Lake County Court of Common Pleas is affirmed.

THOMAS R. WRIGHT, J.,

MATT LYNCH, J.,

concur.

33